[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-10889
_____

D.C. Docket No. 1:05-cr-20859-PCH-1


UNITED STATES OF AMERICA,

                                                            Plaintiff-Appellee,

                              versus

MARITIME LIFE CARIBBEAN LIMITED,

                                                Interested Party-Appellant,

RAUL J. GUTIERREZ,

                                                                Defendant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 16, 2019)

Before WILLIAM PRYOR and MARTIN, Circuit Judges, and WOOD,[*] District Judge.

WILLIAM PRYOR, Circuit Judge:

This appeal involves two questions about an ancillary third-party forfeiture proceeding in which Maritime Life Caribbean asserted that it was given a security interest in the forfeited property: whether the district court erred in requiring Maritime Life to prove the authenticity of the collateral assignment that allegedly granted it a security interest in the forfeited property by a preponderance of the evidence, and whether the district court erred in permitting the Republic of Trinidad and Tobago to intervene in the forfeiture proceeding even though it had no legal interest in the property. We conclude that, although both rulings were in error, neither error warrants reversal. We affirm.

## I. BACKGROUND

Raul Gutierrez pleaded guilty in 2006 to a variety of wire- and bank-fraud charges arising from a bid-rigging scheme involving the construction of an airport in Trinidad and Tobago. After sentencing, the district court entered a preliminary order of forfeiture against him in the amount of $22,556,100, representing the proceeds of his criminal activity. The forfeiture included Gutierrez's interest in a piece of real property located at 12850 Red Road in Coral Cables, Florida, the title

[*] The Honorable Lisa Godbey Wood, United States District Judge for the Southern District of Georgia, sitting by designation.

2

for which was held by Inversiones Rapidven, S.A. Although the plea agreement exhaustively listed Gutierrez's assets and liabilities, it did not mention any encumbrance on the Red Road property.

The Republic of Trinidad and Tobago moved to intervene in the forfeiture proceeding under Federal Rule of Criminal Procedure 32.2. Trinidad asserted that it was a victim of the bid-rigging conspiracy and that it had an interest in any forfeiture proceeds that might result from the sale of the Red Road property, but it did not assert any legal interest in the property itself. The district court expressed skepticism about the propriety of permitting Trinidad to intervene and acknowledged that it was "not sure if [Trinidad has] standing" under the statute governing criminal forfeitures, 21 U.S.C. § 853. Despite these misgivings, the district court granted Trinidad's motion to intervene. It directed Trinidad and the government to "form a committee on the government[/]victim side and decide who will be speaking for that group."

At a later status conference, the government expressed concern over a "potential conflict" between the parties' interests and argued that victims like Trinidad do not "have standing in a forfeiture proceeding." The district court disregarded this concern on the ground that the government was "going to get a lot of cooperation from the lawyers for [Trinidad]" and Trinidad probably would end up "carrying the laboring oar . . . from this point forward." In the district court's

3

view, Trinidad's intervention was permissible because it was the party who was "going to benefit if the government wins on the forfeiture."

In 2010, the district court instructed the government to issue a Notice of Criminal Forfeiture addressed to Steve Ferguson, the former chief executive officer of Maritime Life. Ferguson and Gutierrez were longtime business associates and friends, and both were implicated in the criminal charges underlying the forfeiture proceeding. Maritime responded to the notice by filing a third-party claim asserting an interest in the Red Road property under the criminal-forfeiture statute, 21 U.S.C. § 853(n), and Rule 32.2(c). To support its claim, Maritime produced an alleged collateral assignment that purported to memorialize a transaction in which Gutierrez granted a security interest in the Red Road property to Maritime as collateral for a $2 million loan to Keystone Property Developers, Ltd., Gutierrez's construction company. The alleged assignment is dated July 24, 2001 and was signed by Gutierrez in his capacity as president of Calmaquip Engineering Corporation, but it was never recorded.

The government and Trinidad opposed Maritime's claim. The parties then engaged in protracted discovery in which Trinidad played a significant role, leading 14 depositions on behalf of the government. Maritime objected to Trinidad's participation in the litigation, but the district court denied its motion. The district court acknowledged that Trinidad "does not have a direct claim under

4

[section] 853 or under the forfeiture claim" but permitted Trinidad to proceed, "not in [its] own rights, but . . . to do the work on behalf of the government."

After discovery, Trinidad and the government jointly moved for summary judgment, but the district court denied that motion. Instead, it *sua sponte* decided to hold a bifurcated trial with an initial phase focused solely on the question whether "to admit the collateral assignment as being genuine and authentic" under Federal Rule of Evidence 901. The second phase was to address the merits of Maritime's interest in the Red Road property. The district court explained that the question of authenticity was "a nice clean issue" that, if resolved against Maritime, would obviate the need to resolve the complicated dispute about the legal effect of an unrecorded assignment of a security interest in real property for which Gutierrez, the party who allegedly conveyed the assignment, did not hold title. Maritime objected on the ground that the authenticity issue should be consolidated with the merits issues, but it later conceded that an adverse ruling on authenticity would make the "other issues . . . go away."

At the hearing for the first phase of trial, Maritime presented three witnesses: Lesley Alfonso, the Maritime director who allegedly discovered the collateral assignment; Frank Norwitch, a certified document examiner who reviewed the collateral assignment; and Raul Gutierrez, who allegedly signed the assignment. The government presented no live witnesses. Alfonso testified that in early 2010,

5

Andrew Ferguson, Maritime's chief executive officer and the son of Steve Ferguson, asked her to search for any documents related to the Red Road property. She asserted that she discovered the assignment in the files of a deceased Maritime executive who had managed the loan transaction with Gutierrez. Alfonso also testified that she returned to the storage room to ensure that there were no other documents responsive to the description she was given. Cross-examination by the government and questioning by the district court made clear that this testimony conflicted with Alfonso's earlier deposition testimony, in which she agreed that she did not have "occasion to go back into the storage room and look at the folder or anything else that was around that document."

Norwitch testified as an expert after the government stipulated to his qualifications. He testified that he examined the watermark and the ink used in both the typed and handwritten portions of the collateral assignment and concluded that there was "no evidence that this document was anything other than what it is purported to be." But Norwitch explained that the ink used in the document has been in commercial use for decades and that he could not determine "when [the] document was signed." And Gutierrez testified that he executed the collateral assignment on July 24, 2001, after Maritime requested additional collateral. He admitted that he failed to list the assignment in his presentence investigation report and testified that he never thought to record the multi-million-dollar transaction.

6

Gutierrez also acknowledged that he had been convicted of crimes of fraud and that he had falsified his community-service hours after being released from prison.

After the hearing for the first phase of trial, the district court ruled that Maritime had failed to carry its burden of proving the authenticity of the collateral assignment "by the greater weight of the evidence." The court determined that circumstantial evidence and unexplained defects present on the face of the document undermined the inference that the assignment was authentic. It also determined that the expert testimony was inconclusive, that Alfonso and Gutierrez were not credible, and that virtually no evidence corroborated the authenticity of the assignment. Having ruled that the collateral assignment was inauthentic, the district court concluded that it was unnecessary to proceed to the second phase of trial and denied Maritime's claim.

## II. STANDARD OF REVIEW

"We review a district court's legal conclusions regarding third-party claims to criminally forfeited property *de novo* and its factual findings for clear error." *United States v. Marion*, 562 F.3d 1330, 1335 (11th Cir. 2009).

## III. DISCUSSION

We divide our discussion in two parts. First, we explain that although the district court applied the wrong standard when it assessed the authenticity of the alleged collateral assignment, the error was harmless. Second, we explain that the

7

district court erred by permitting Trinidad to intervene, but this error too does not warrant reversal.

### A.  *The District Court Committed Harmless Error in Ruling that the Collateral Assignment Was Inauthentic.*

The district court ruled that the "burden of proof" was "on Maritime to prove by the greater weight of the evidence that the collateral assignment" is "an authentic document," but this ruling was in error. Even so, Maritime has suffered no prejudice.

A two-step process governs the determination of whether a document is authentic. The district court must first make a preliminary assessment of authenticity under Rule 901, which "requires a proponent to present 'sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be.'" *United States v. Lebowitz*, 676 F.3d 1000, 1009 (11th Cir. 2012) (quoting *United States v. Belfast*, 611 F.3d 783, 819 (11th Cir. 2010)). If the proponent satisfies this "prima facie burden," the inquiry proceeds to a second step, in which "the evidence may be admitted, and the ultimate question of authenticity is then decided by the [factfinder]." *Id.*; *see also In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1267 (11th Cir. 2015) ("Once [a] prima facie showing of authenticity [is] made, the ultimate question of the authenticity of the documents [is] left to the factfinder.").

8

The first phase of the bifurcated trial framework adopted by the district court was intended to address only the preliminary question of authenticity. Under the two-step process contemplated by Rule 901, Maritime bore the burden of establishing a prima facie case of authenticity at the first stage. Only at the second step would "the trier of fact . . . appraise whether the proffered evidence is in fact what it purports to be." *United States v. Caldwell*, 776 F.2d 989, 1002 (11th Cir. 1985).

By requiring Maritime to prove authenticity by "the greater weight of the evidence," the district court compressed the two steps of the inquiry under Rule 901 into one and conflated the issue of authenticity with the issue of entitlement to the proceeds of the sale of the Red Road property, but this technical error need not warrant reversal. Federal Rule of Civil Procedure 61 permits reversal based on a trial error "only where the error has caused substantial prejudice to the affected party (or, stated somewhat differently, affected the party's substantial rights or resulted in substantial injustice)." *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004) (internal quotation marks omitted). The error by the district court prejudiced Maritime only if there is a "reasonable likelihood that the outcome would have been different" if the district court had ruled that Maritime satisfied its burden to prove a prima facie case of authenticity before proceeding to

9

determine whether Maritime had an interest in the Red Road property. *United States v. Jeri*, 869 F.3d 1247, 1262 (11th Cir. 2017).

Maritime suffered no prejudice. If the district court had followed the process contemplated by Rule 901, it would have answered the ultimate question of authenticity in the same way; the outcome of the trial would not have differed.

The first phase of the trial featured all of the evidence relevant to the question of authenticity. Maritime was on notice that the district court would apply a preponderance standard in determining whether the assignment was authentic and had every incentive to produce all relevant evidence. The second phase would have been a bench trial, *see* 21 U.S.C. § 853(n)(2), so the district court inevitably would have reached the same answer to the "ultimate question of authenticity" when it acted as the finder of fact. *Lebowitz*, 676 F.3d at 1009.

The district court was entitled to find that the assignment was not authentic under the preponderance standard applicable at the second step of the inquiry under Rule 901, and Maritime's claim was bound to fail if the assignment was inauthentic. Maritime never asserted any other potential source of an interest in the Red Road property, and its trial counsel even conceded that it "only has a claim if it has an assignment." In other words, Maritime's claim stood or fell with the authenticity of the collateral assignment.

10

The collateral assignment was suspect on its face. It was neither witnessed nor notarized, even though Raul Gutierrez admitted that his secretary was a notary. The document does not so much as mention the legal titleholder of the Red Road property, Inversiones Rapidven, and contains no legal description of the property. The document was printed on Calmaquip letterhead, even though Lesley Alfonso, a Maritime director, testified that it was the practice of Maritime to prepare its own loan documents. The assignment was purportedly created to secure a limited guarantee agreement in which Maritime lent $2 million to Keystone Construction. The assignment states that the limited guaranty agreement was attached to it, but Alfonso testified that nothing was attached to the assignment when she allegedly found it. Maritime's own expert concluded that there was no evidence suggesting that anything had ever been attached to the assignment. And the assignment was never recorded—an astonishing oversight in a multi-million-dollar transaction.

Circumstantial evidence also supported the finding that the assignment was inauthentic. The limited guaranty agreement makes no mention of the collateral assignment. And as the district court explained, there was "not a single document" that "referenced the collateral assignment . . . before or after" the assignment was allegedly executed, other than a letter that Gutierrez purportedly sent to Richard Lacle, his associate at Inversiones Rapidven. This letter lacked any indicia of authenticity, such as a letterhead, physical or email address, or method of

11

transmission. And Lacle denied ever receiving the letter and suggested that it was fabricated. And finally, Gutierrez listed the Red Road property as an unencumbered asset in his presentence investigation report and failed to list the collateral assignment as a debt.

Based on this evidence, the district court was entitled to infer that there was a *post hoc* plot between Gutierrez and Maritime to spare the Red Road property from forfeiture through a fabricated assignment of an interest to Maritime. As we have explained, "[a] district court has discretion to determine authenticity, and that determination should not be disturbed on appeal absent a showing that there is no competent evidence in the record to support it." *United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir. 2000). Even if we were to assume that Gutierrez's signature on the assignment is genuine, it is entirely possible that he signed shortly before he went to prison in an effort to shield his property from forfeiture. Ample evidence established the existence of a close relationship between Gutierrez and the officers of Maritime. We reject Maritime's assertion that Gutierrez could not possibly have anticipated that the government would seek forfeiture of his property. We expect that a person who knows he is under investigation in a case of complex financial fraud could have foreseen the impending forfeiture.

12

Ample evidence supports the finding by the district court on the ultimate question of authenticity. And that finding controlled whether Maritime had an interest in the Red Road property. So no prejudicial error occurred.

### B. Trinidad's Intervention Does Not Merit Reversal.

Maritime also argues, and we agree, that the district court erred in permitting Trinidad, a foreign sovereign, to intervene in the ancillary proceeding to litigate on behalf of the United States. To represent the United States, an attorney must be either a United States Attorney, an assistant United States Attorney, or a special attorney. *See* 28 U.S.C. § 541(a) (creating procedures for appointing a United States Attorney for each judicial district); *id.* § 542(a) (creating procedures for appointing assistant United States Attorneys); *id.* § 543(a) (creating procedures for appointing special attorneys to assist United States Attorneys). And every attorney representing the United States must take an oath of office. *See id.* § 544 (requiring United States Attorneys, assistant United States Attorneys, and specially appointed attorneys to take an oath to faithfully execute their duties). Trinidad was not specially appointed to litigate on behalf of the United States and took no oath of office.

Nor did Trinidad have standing to intervene to defend its own interests. Congress has created one—and only one—means for interested third-parties to participate in a criminal-forfeiture proceeding: asserting a "legal right, title, or

13

interest" sufficient for standing in an ancillary proceeding, 21 U.S.C. § 853(n). Section 853(k) of the statute governing criminal forfeitures provides that "[e]xcept as provided in subsection (n), no party claiming an interest in property subject to forfeiture under this section" may "intervene in a trial or appeal of a criminal case involving the forfeiture of such property under this section." *Id.* § 853(k). As we have explained, "[a]n ancillary proceeding constitutes the sole means by which a third-party claimant can establish entitlement to return of forfeited property." *United States v. Davenport*, 668 F.3d 1316, 1320 (11th Cir. 2012). Trinidad made no attempt to intervene under section 853(n) and did not assert any "legal right, title, or interest" in the Red Road property, 21 U.S.C. § 853(n).

Although there was no legal basis for Trinidad's intervention, this error too does not warrant reversal. Maritime makes two arguments about prejudice, but neither is persuasive.

First, Maritime argues that Trinidad's participation was prejudicial because the district court relied on deposition testimony elicited by Trinidad in finding a material inconsistency in the testimony of Alfonso. But the bare fact that the district court relied in part on evidence generated by Trinidad to discredit Alfonso's testimony does not prove prejudicial error. As the district court stated, its ruling against Maritime did not depend on its rejection of

14

Alfonso's testimony. The district court concluded that "even if" Alfonso "were credible," it was "just as likely" that the collateral assignment "could have been placed there by anybody, and then she was sent . . . on her merry way to find that document." The district court was entitled to credit this alternative explanation of the discovery of the collateral assignment in the light of the numerous deficiencies in the document itself and the surrounding circumstantial evidence that it was not genuine.

The district court also had another, independent ground for discounting Alfonso's testimony: that she was not "an unbiased witness." Alfonso is a former employee and current director of Maritime. She had an obvious incentive to tailor her testimony to support Maritime's interests. And regardless of whether we would have regarded this incentive as sufficient to discredit Alfonso's testimony in the exercise of our independent judgment, the credibility determination by the district court is binding on us. As we have explained, "[t]he credibility of a witness is in the province of the factfinder," and we "will not ordinarily review the factfinder's determination of credibility." *United States v. Copeland*, 20 F.3d 412, 413 (11th Cir. 1994).

Second, Maritime argues, based on *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), that permitting a third party to litigate on behalf of the United States in an ancillary forfeiture proceeding is structural

15

error, but this argument is a nonstarter. In *Young*, a plurality of the Supreme Court concluded that the "appointment of an interested prosecutor" in a criminal contempt proceeding is a structural error. *Id.* at 810. This rule does not apply to an ancillary proceeding conducted under section 853(n) because such a proceeding is civil in nature. *See, e.g.*, *United States v. Douglas*, 55 F.3d 584, 586 (11th Cir. 1995) ("Congress therefore viewed a [section] 853(n) hearing as a species of an 'action at law or equity'—a substitute for separate *civil* litigation against the government."); *United States v. Gilbert*, 244 F.3d 888, 907 (11th Cir. 2001), *superseded by rule on other grounds as recognized in United States v. Marion*, 562 F.3d 1330 (11th Cir. 2009) (expanding *Douglas* to other kinds of forfeitures). Indeed, if there were a constitutional prohibition on interested private parties representing the United States in civil actions, the validity of statutes such as the False Claims Act, 31 U.S.C. § 3730, would be doubtful.

Trinidad's intervention did not affect Maritime's "substantial rights." Fed. R. Civ. P. 61. Although the district court erred in permitting a foreign sovereign with no interest of its own to litigate on behalf of the United States, this error does not require reversal of the dismissal of Maritime's claim.

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of the United States.

16